Case No. 21-719 et al. National ATM Council, Inc. et al. v. Visa, Inc. et al. at Balance. Mr. Anderson for the MasterCard and Visa at Balance. General Issues and Issues Specific to the Consumer Classes. Mr. Eisenstein for the MasterCard and Visa at Balance. Issues Specific to the ATM Operator Class. Mr. Rubin for the ATM Operator at Belize. Mr. Cooper for the Macman at Belize. Ms. DeLavelle for the BERT at Belize. Good morning, Mr. Anderson. Good morning, Judge. May it please the Court. My name is Justin Anderson. I represent MasterCard in this appeal from the Eronia Certification of three classes challenging nondiscrimination rules applicable to surcharge ATMs. I will address the two consumer classes and arguments that pertain to all three classes. My colleague, Matthew Eisenstein, who represents Visa, will address issues specific to the class of independent ATM operators. Your Honors, the class certification in these cases violates settled circuit precedent and must be reversed. In Ralefray, this Court held that Rule 23 commands a hard look at injury models. Claims put forward in the District Court to satisfy their burden of proving predominance. That hard look did not happen here. In the District Court, MasterCard and Visa showed that each plaintiff's model of injury contained false positives. They swept in class members who could not have been injured. But the District Court did not scrutinize the evidence that we presented. The Court considered uninjured class members to be irrelevant to the question of class certification and deferred the issue to the merits phase of the case. It held that plaintiffs had a burden to only show a reasonable or colorable model of injury. That was error. The District Court's analysis is directly contrary to Ralefray, which instructs that it is, quote, indisputably the role of the District Court to scrutinize evidence before granting certification, even when doing so requires inquiry into the merits of the claim, end quote. Whether the injury model can establish class-wide injury and withstand that level of scrutiny is not just a merits question. It is a question for class certification. But why shouldn't we understand on review for abuse of discretion that what the District Court said was, I see general claims on the plaintiff's part that every class member was injured, and I see evidence sufficient to support that. I see defendants countering with a different way of analyzing the evidence that, by the way, is also a wholesale, you know, approach to a subset of the class. I'm satisfied that that is a situation in which common issues predominate, and I'll make the final call, or the jury will make the final call, as to which analysis ultimately on the merits they accept. But isn't the predominance inquiry a filter that's supposed to look at, are these wholesale questions? Or are these case-by-case questions? And I don't actually see evidence in this record that's not wholesale. Your Honor, that's exactly the right question that the District Court should have answered. It should have asked that question and addressed the question. Instead, it held the burden, the claims to the burden only of showing a model that was colorful or well-accepted. What the District Court should have answered is this question. Is there common evidence that in one fell swoop can show that all members of the class were injured? That question, Your Honor, cannot be satisfied by the models here. Now, the District Court did not scrutinize the evidence that we put forward. However, we showed that using... You said you did. Your Honor, the District Court said that he was applying a standard that helped his plaintiffs to only show that the models were reasonable. He said that the Mackin class had put forward a, quote, colorful and well-accepted methodology. That the Burr class had put forward a well-accepted methodology, and this was not an adjudication on the merits. He said that the independent ACM operators put forward both a colorful methodology, and it referred to our contesting of the merits as a question for the merits. That's directly contrary to Rail Freight, where this Court said that plausible is not enough. Quote, workable is not enough. The District Court needs to take a hard look at the models that are put forward to determine whether they can identify injury across the class. Because if you can't show class-wide injury in class certifications, we will raise this point again in summary judgment, and we will argue that there are class members who lack standing. And there are tens of thousands or more, hundreds of thousands, potentially in light of the fact that we put in front of the District Court. The District Court was required to scrutinize and grapple with that evidence. The plainest theory in these cases on the consumer side is that for every one-cent reduction in net interchange that ACM operators receive, they increase surcharges on consumers by one cent. It's a one-to-one relationship. It's a simple model of injury. They say every class member was injured in that fashion. We scrutinized the evidence in the case, and we found for one of the country's largest banks that they did not raise surcharges at all during the class period and during the time frame that their experts evaluated. But that means if any class member who withdrew cash from that ACM was uninjured, and at its trial, the MasterCard and Visa would have the right to introduce evidence as to each class member, whether they withdrew cash from that ACM or one of thousands of other ACMs that did not increase surcharges during the class period to show they lack injury, lack standing in this case. What the plaintiffs said in response, though, was not, oh, yeah, let's do one-by-one trials, nor even, oh, you're right, there are some who are uninjured. What they said was you didn't go back, the surcharges were raised earlier, and you don't account for that. And so I guess I'm, you know, and the district judge does say all three plaintiff groups have demonstrated that common evidence will predominate in proving each element of their claim. So you can pull out, you know, infelicitous comments that he makes about plausible or reasonable. I guess for me it would be helpful to know more concretely what standard you think does apply. You know, this has been a contested question across the circuits. And I understand the court should make findings, but should it say I reject your evidence and I credit the plaintiff's evidence? I took it to be more what we agreed to before, which is that it should look at the character of the dispute. Is it between wholesale and wholesale? Or is it something that, you know, some granularity that is inevitable? Your Honor, this court has already spoken to that question twice in the Rail Freight cases. Can you give me more help in that? I don't know. I think this is, in Rail Freight 1, the issue was that plaintiffs were seeking to recover damages for wholesalers who had purchased on contracts that were set before the alleged antitrust violation began. And that's what prompted that section. How could those people have been injured if they had locked in rates before the challenge activity began? And to the extent the model swept in uninjured class members, it failed the question of predominance. And that was the basis for the initial decision. That is the same issue here. How can someone who withdrew cash from an ATM that did not increase the surcharge, either in response to the reduction at interchange, or some of them at all, argue that they've been injured? What is the basis for the injury when they did not pay the overcharge? It's the same question. I don't want to be clear as to how far your argument goes. In other words, I'm clear as to your point about the district court's articulation of the legal standard he was to apply was erroneous as a matter of law. Now, you want us to reverse the district court's decision. My question is, the way the arguments are made that you've presented as to, for instance, the largest ATM, maybe the class needs to be redefined in light of the appropriate standard to exclude those consumers. But it doesn't necessarily, or does it, foreclose the district court from, I'll just say in a sense, reaching the same result that a redefined class should be certified, as distinct from our deciding this case can never go forward under any definition of a class. And, of course, if we reverse and remand, we wouldn't be doing that. But I just want to be clear, because your argument says that, you know, a large number of potential class members. But I just want to be clear, does that mean even under the correct standard, or you're not deciding that now, but I want to be clear, when you said we should just reverse, I wondered whether that was what you were arguing. In fact, even though under abuse of discretion, review and error of law is an abuse of discretion. And so we would send it back and let, normally in cases, let the district court apply the correct standard. But we wouldn't suggest no remand, thereby suggesting that there could be no other result on remand once the district court applies the correct legal standard. We are asking for a reversal or remand with instructions to be certified. And we recognize that that is not the course that the court would take ordinarily. But this case presents a unique scenario where it is a question of law about whether the district court applied the correct standard. He did not. If you apply the correct standard here, the undisputed facts show, because plaintiff's own experts admit that there are ATMs that did not meet the surcharges in response to the reduction in energy. I'm not contesting that argument that you make. I'm just asking, could not the district court, or do you say it would be impossible for the district court, even upon applying the correct standard, on remand to offer the plaintiff an opportunity to redefine the class and then determine on the basis of that redefined class whether or not the plaintiff has met their burden? It would, Your Honor. Under the applicable standard, the plaintiff has simply not given the district court the tools it would need to approve a class that widows out uninjured class members. And that's why we referred the court to the Third Circuit precedents in Ferraris and King v. Rice, USA, and the Eighth Circuit decision in Puddock. In those cases where even if you remanded to the district court, remand would be futile because there is no ability, and the plaintiff's court has come forward with no proposal for how they would winnow out the class members who withdrew cash from ATMs that did not meet their surcharges in response to the reduction in energy. That is not the way we typically deal with legal error and factual error. When the Supreme Court has told us a long time ago the district court is relying on the incorrect statement of law, you send it back and the district court's now got to apply what we tell them. The correct statement of law, and then find the fact. I'm listening to you carefully. What you're asking us to do is make findings of fact. We have been told over and over again we don't do that. Mr. Your Honor, we're not asking you to make findings of fact. We are asking you to reverse on the undisputed record here. We are not contesting that basis experts in their rebuttal reports found that for certain ATMs where there was no statistically significant relationship between the reduction of net interchange and increase in surcharges. They admit there's no need for fact-finding. On their own experts' analysis, there are uninjured class members in this case. Plaintiffs have waived any rights argued that they're entitled to show that there's a winnowing mechanism that could filter them out. Each one of them, all three sets have doubled down in their briefs saying every class member paid a surcharge. I think what we're trying to get at is you're precluding the district court, and I just want to be sure you're making this argument as a matter of law, from saying to the plaintiffs, well, the models you've given me now are insufficient for many of the reasons your clients point out. I mean, their experts just hypothesize about things, et cetera. They don't point to hard data. But suppose the plaintiffs said, well, we want to redefine the class. And I don't want to go too far here, but just assume they said, well, we accept the point that the largest ATM, there's no injury as to them. But there are these other people. Now, it may be a much smaller class, but your argument seems to preclude that opportunity for the plaintiffs. And I gather from what your response to me is, well, they waived any argument. And I just wondered, in other words, you're saying they'd have to start all over again and file a new complaint. Your Honor, that's right. This case has been pending for 10 years. It was ratified in 2013. This is not a new legal standard. The plaintiffs are represented by able counsel and assisted by economists whose credentials are well accepted. They had every opportunity to argue that if there were uninjured class members, they had a model for winnowing them out. We had discoveries now. This case is, the record is closed on both expert discovery and fact discovery. For them now to go back to this report and reopen that record and propose some fashion of winnowing out uninjured class members would be an unfair burden, unfairly prejudicial to the defendants who have lived with this case for the last 10 years. Your Honor, I- You had a time limit to file your petition for review. But I initially thought, well, why didn't you file a motion for reconsideration by the district court, making the legal arguments you've made? And in that situation, hypothetically, the district court might have said, oh, yes, I'm relying on this vitamins decision. But the circuit and the Supreme Court have abandoned that colorable approach. And now the standard is different. And so I'm going to apply that standard. And so I gather part of your argument was you pointed all this out to the district court and nevertheless, it ruled as it did, applying the vitamins colorable standard, which was no longer the standard that applied. That's right, Your Honor. Normally, if you file a motion for reconsideration, you have to tell the judge, here's the new thing we want you to consider. And we had put all these arguments in front of the district court in our briefing. The question of predominance, the question of uninjured class members was not some side issue. This was the issue. This was the issue that we contested. There were other smaller issues, but this was the main issue that we contested class certification on with these classes. Your Honor, I had to... What is the standard that you think the district court should apply? It should take the hard look that this court said is required in real appraise. The Supreme Court has called it a close look in Comcast, also a, quote, rigorous analysis, end quote, that's from Comcast. And in Walmart, the Supreme Court said the court must make findings. That's a quote, even if it, again, overlaps with the merits. One of those things... How can we confidently say, reading the district court's opinion, that it didn't take a hard look, a close look, make a rigorous analysis and, indeed, the district judge said, I find and makes the findings. I mean, it's... Your Honor, if that was sufficient, this court would be deprived of public review in any case because every district judge would be counted on... No, we have real appraise and we said, you know, there's some scientific knowledge there, the limitations, and didn't have a comeback. And we said, okay, no class. The real appraise was the Comcast. So, the first real appraise decision was decided when the district court did not have the benefit of the Comcast decision. So, on appeal, the panel acknowledged that the district court was applying old law. So, in that case, it cannot be the case that this court only has the ability to review district court decisions when the district court acknowledges that it is not doing what the standard requires. It can't be the case... So, it's... I mean, Comcast is a much clearer, different case, right? There, there were four different theories. Only one of them was deemed viable, but the plaintiff or the district court continued to rely on a damages model that was predicated on all four. We just don't have something like that. The way I read Comcast and real appraise decisions, they're pointing to particular kinds of errors. You know, they just acknowledged that there was, you know, some 12 plus percent of uninjured classroom didn't have a comeback on that. You know, we just talked about this. You haven't pointed that kind of defect here. It's really, you know, we have this one take on the data. They have a different take. They're saying everybody's injured. District judge isn't saying they're right, but is saying they've come forward with that. And that's standard evidence. It's evidence that could be credited. Good enough. Part of the problem is that good enough for the district court is not good enough based on the standards the Supreme Court has announced and this court has not taken place. In Comcast and Walmart both real appraise decisions. If this report did not just say good enough, it needs to take a hard look at the evidence, scrutinize evidence that's put forward by the defendants, and determine whether the models can withstand that scrutiny and show that common evidence will establish class-wise and is capable of establishing class-wide injuries. That hard look did not happen here. And this court did not refer to decisions that clearly apply the wrong standards simply because the court writes I've considered the evidence and concluded X. That is still not sufficient to meet a hard look rigorous standard that's required here. Otherwise if we've got the standards, if we've got the precedence from this court, you're not afraid that Comcast and Walmart, that this is not a class certification, it's not a perfunctory stage similar to a motion to dismiss. This is a case, this is a stage in the case where the district court must take a hard look and resolve disputes between the parties about whether the injury model that plaintiffs put forward is capable of showing class-wide injuries. Here plaintiffs came forward and said everyone is injured because for every one cent the deterrence without surcharge goes up by one cent. We showed the district court that there are tens of thousands in the record of plaintiffs swept in who withdrew cash from ATMs that never increased the surcharge in response to the decrease in net interchange. The judge needed to grapple with that. And if he had, Judge Rogers, he would have found that the evidence is indisputable. There are uninjured class members in this case. We are not asking for fact-finding. We are asking this court to file off the undisputed facts in this case, which is that there are ATMs that did not increase surcharges in response to the reduction in net interchange. Thank you. I'm going to try to avoid repeating what Mr. Anderson said, but the district court's decision as to the independent operator case did not apply the right standard and should be vacated for the same reasons as the consumer cases. Because these plaintiffs do not have common proof that they can use to establish injury to all class members as they find the class. These plaintiffs say that their injury is that all class members paid an inflated acquirer fee. But we know from the record that many class members did not pay those fees directly to the network or indirectly, such as by receiving a portion of interchange revenue from which acquirer fees are deducted. Here's how we know that, and the key facts here as to this case really are undisputed. These plaintiffs concede that they took the information from a Visa rule. They say that at page 9 of their brief, they say that at page 10 of the brief, they say that in footnote 5 of their brief. Visa's definition of an ATM operator is very broad. It's designed to track entities that could have access to information at independent ATMs and therefore could present fraud or other risks to the network. We know that from JA-6808, which is a declaration from the head of Visa's ATM business. We know that from JA-7026, which is a document adopting the Visa rule. The documents make clear that the definition that they use, the Visa definition, which is the same as their class definition, has nothing to do with which entities pay acquirer fees directly or indirectly. It has nothing to do with which entities manage cryptographic functions. It's much broader because its purpose is to minimize risk of fraud. And the documents make clear that there's a range of entities, more than one entity per terminal, that can satisfy the definition of an ATM operator. But the class definition is narrower and explicitly excludes a lot of the entities that I think you say are muddying the waters. No? That's incorrect, Your Honor, respectfully. It's the same. The definition is coextensive. They're the same. So, for example, a merchant that owns an ATM is in... that owns an ATM and that loads cash in the ATM. He's a class member. It's a ATM operator. We know that. There's an example at JA-6078. It is a form filled out by a merchant that meets the definition of an ATM operator. We know from JA-6070, which are guidelines from an acquiring bank, that there can be more than one ATM operator per terminal. That's important because you could take an example of an ATM at a corner store here in D.C. If the merchant owns that ATM, it can be the ATM operator. If there's a sales entity that deployed the ATM to the owner, it can be the ATM operator. If there's an entity that provides actual processing services, it can be an ATM operator. Sometimes those entities receive the net interchange or share in it. Other times they don't. So, whether they receive net interchange or are paid to acquire it, which is the injury they say exists, is irrelevant. Where do we know that sometimes they receive net interchange and sometimes they don't? Your Honor, we know that, and I apologize since I'm throwing a lot of sights at the court, but it's important because this is exactly what Judge Leon didn't do, which is scrutinize evidence in the record of uninjured class members. So, we know from JA-6108, and that is a class member in this case that's talking about merchants who own and load, have own and load arrangements, and it makes clear that sometimes they do pay acquire or sometimes they do pay acquire fees indirectly to these merchants, and other times they don't. He set out for the merchants that he deals with, it's 30% versus 70%. My question was, I thought you had asserted that sometimes they receive net interchange and sometimes they don't, and now you're talking about whether they pay acquire or fees. Right, I mean it's, they receive net interchange from which the acquire or fees are deducted, and as I understand it, that's the plaintiffs, ultimately what the plaintiffs say. What we're saying to you, Your Honors, is that there are ATM operators that do not receive net interchange at all. So there's that testimony. Is there anything else? Yes, there's testimony at 5460 and 5461, which is another example of merchants in these own and load circumstances that sometimes, so the question was in that circumstance, in most they own, they load arrangements, the customer does not receive any interchange, and the answer is that. And then there's another question, do any customers with, they own, they load arrangements, pay network fees, and this is for this. Customers here, meaning independent. Meaning, yes, meaning ATM operator, meaning a class member, as they have defined class, which is the same as the definition of the Visa rule. Let me just, if I may. I want to ask you a question, and I asked Visa Council a question, but I need to be clear that you take the same position. If this court were to hold that the district court in applying a colorable standard based on the vitamins decision in the district court, that that was a clear error of law given that this court and the Supreme Court have rejected that standard in determining the burden that the plaintiffs face. So hypothetically, just suppose we say that, and we remand the case to the district court, and the plaintiffs say, well, in light of the remand, in light of this post vitamins authority, we want to concede the point that, or the district court to find that we agree with the defendant's experts and what the record shows, but it doesn't show that there are no consumers or no operators who had to pay these fees. And that's what I need to be clear about. Why wouldn't on remand the district court be required to do the type of meticulous record review where you're citing all these pages in the joint appendix and make conclusions? And suppose where the class has originally proposed, you know, involved millions. When the district court looks at the record closely, and sees what's there, and that his colorable standard is no longer the standard that applies to models, he determines, well, under this more rigorous standard, I agree that the plaintiffs haven't met their burden as to some of the members of the defined class. And then the plaintiffs say, fine, we want to redefine the class in light of this new standard. And when I heard the counsel tell me, well, this case is 10 years old. It's just too late to give them another chance. Is that your position too? Your Honor, it is my position and there is a particular reason with respect to the ATM operators. For them, they cannot narrow their class definition to just refer to entities that pay, acquire fees directly or indirectly. They can't do that because their entire liability and causation theory is that these rules restrain ATM operators, class members, from setting surcharges at different levels based on the ATM network. If the class is limited to entities that may acquire fees directly or indirectly or received net interchange indirectly or directly, it would exclude significant swaths of entities that are actually responsible for setting surcharges at the terminals. And this class needs to have those entities they need it for their theory of liability and their theory of causation, which is that these rules affect the ATM operators. You've just done a beautiful job of articulating what I think Judge Leon found to be a sufficiently general theory of liability. If it's accepted, then, although it may show up in the wash in different places for different independent ATM operators, if the plaintiff's theory is accepted, they are all harmed. They may, you know, receive it in different ways, in different fractions, but it's out there in the market. This non-competitive price that imposes opportunity costs on businesses that would offer a cheaper service if they could. Why isn't that a classic predominance? Your Honor, that is exactly the issue that requires individualized inquiry, because we take a single ATM, and we look at the entity that's responsible for setting the surcharges, we look at the entity, there may be a different entity that's getting the acquire fee. If there are different entities, if there are different reasons for changing surcharges, for example, at a casino where they just want to jack up surcharges and there's a different entity that's receiving the economics from the network, then it really does boil down to an individualized inquiry, and the common evidence they have of injury, which is of the payment of acquirer fees, cannot be applied to the class as a whole, because we know there are uninjured class members. I would follow that. Just because I'm willing to take this as a loss leader because I want to bring people into my casino, it doesn't mean that it's not a piece of my financial equation that could be different, but for an anti-competitive rule. What they need is common evidence to establish injury, and they have defined, they say, all class members, as they've defined it, are injured by the payment of an inflated acquirer fee. And we know, based on this class definition, that there are entities that don't pay that acquirer fee at all. And so, therefore, this common evidence they have can't be used for all of their classes. What's your best example of the ones that don't pay? Can you explain, in a way, if you're trying to make this theory make sense, not just throwing up things that aren't explained. Can you affirmatively explain why it would be that there would be entities that don't pay the acquirer fee? I appreciate that, Your Honor, and I've cited a few examples from the record. You can think of, again, let's go back to our corner store. The ATM is rolled in to the corner store. The merchant has the discretion, the corner store itself, as an ATM operator, has discretion to set surcharges at whatever level it wants. In this situation, just bear with me. If that's in the record, there are examples of merchants that have the ability to set surcharges. They have the discretion. They are ATM operators. They're also able to use their discretion to set them below Visa and MasterCard to set them at the level they want consistent with the rules at issue. They can surcharge everybody $5. They can surcharge everybody $10 for taking out cash. How about $2? How about $1? Yes. We're not talking about the operation of the rule. We're talking about here that there's a distinction, Your Honor, between the operation of the rule with respect to the entities that it restrains, on the one hand, and the entities who these plaintiffs are claiming are harmed, which are the ATM operators that are actually paying the acquirer fee indirectly. They don't have to be the same. That's part of the problem here. The record sites we provided, I think, illustrate that. I see I'm way over time. I will just emphasize that a rail freight to this court has made clear that it's improper to defer questions about the number and nature of individualized inquiries that might be necessary to establish liability. That's exactly what happened below. Do you have a other than hard look, rigorous...  I have, Your Honor, is the language from rail freight to... I believe that language ought to apply here. I just read it, and I do. I agree with my colleague, Justin Anderson, on that issue. Thank you. Thank you very much, Anderson. I think you're not seeking any rebuttal, but Mr. Anderson is. Thank you. All right. I believe we hear next from Mr. Rubin. Good morning, Your Honor. May it please the court? I'm Jonathan Rubin with Mogen Rubin LLC on behalf of the ATM operator plaintiffs. My comments today will be addressed solely to the case brought by the plaintiffs. The issues involved with the operators are substantially different, as is the nature of the class and the nature of the claim. We're stricking our attention to the ATM operator plaintiffs. I think it's clear. It's been said before that the standard of review is abusive discretion or clear legal error. This is a very deferential standard, and we don't believe that, and in addition, the D.C. Circuit case law calls out in several cases that it's the district court that is uniquely well situated. We don't believe the defendants have met the standards and have established that there is any abusive discretion or any legal error. There is no indication in the briefs or elsewhere that the court failed to consider anything. Mr. Rubin, is it always true that the acquiring bank remits net interchange to the ATM operator? Thank you for the question, Your Honor. There's a great deal of confusion, some of which was just presented to this court. There are certain layers that exist in the industry that exist because the networks do not permit non-financial institutions to be members. Accordingly, there's the network at the top layer, there is a layer of financial institutions there under, and other financial institutions there are non-financial institutions. One of the basic pieces of advice that I give to people arguing is that when somebody asks you a question, I can't even absorb what you're saying unless you tell me before you get going into the details, yes or no. Is it always true that the acquiring bank remits net interchange to the independent ATM operator? Your Honor, the word remit suggests that there is a payment from the acquiring bank to the network. We do not believe the acquiring bank touches any of the money. The acquiring bank is lending their credentials as a member of the network to the ISO, which and the acquiring bank is not the correct term here. It's incorrectly stated in Appellate's brief. The correct term is sponsoring bank. There are four or five sponsoring banks that sponsor independent ATM. We have testimony in the records from the processors who specialize in processing ATM transactions that the acquiring banks, pardon me, the sponsoring banks do not touch the money. The money is paid by the processors who are in the layer between the networks and the parties. What happens is that Mr. Eisenstein... And do the processors always, do the ATM operators get that? What happens is the ATM operators on a per transaction basis are entitled to a payment of interchange. Sometimes it's called reverse interchange because it's different from the point of sale interchange. But that is an additional revenue stream on a per transaction basis that is paid by the issuing bank to the ATM operator through the processor. So you're saying the ATM operators do get this. They are entitled to interchange. They get interchange on every transaction and that interchange when the processor passes it to the ATM operator, they deduct the network fee and send it to the network en masse for all of their ATM operator customers. And is there a place in the record you would point to? I don't have the inside but it's the testimony of Paul Willingham who is a functionary with Switch Commerce which is a processor that specializes in ATM processing. I think the crucial point I need to make at this point, however, is that every ATM operator is entitled to receive interchange. It gets the interchange and what it does with it is what Mr. Eisenstein was talking about. Downstream from the ATM operator are other parties, in particular the location owner. The location owner is the customer of the ATM operator. There are arrangements that the ATM operator says as part of payment of rent we will give you a portion or all of our interchange revenue. Mr. Eisenstein has bolded this report that because of that the ATM operator does not pay acquiring fees. This is plainly ridiculous. It is as if I were to say that because my employer deducts my taxes from my paycheck and pays me a net salary, I don't pay taxes. My employer pays the taxes. It is clear from the report of Dr. McAndrews who was a research head of research for the New York Fed for six years that the economic incidence of ATM acquirer fees falls on the ATM operator regardless of what they do downstream with their customers. Whether or not they give their interchange away does not affect whether they have suffered the incidence of the acquirer fee. The I urge the court to take a look at the announcement in 2005 where Visa introduced the term ATM operator. The class definition is not a wholesale adoption of Visa's terminology. We have taken their approach to defining ATM operator as the entity in the environment that does certain things. One of the things they do is give the instructions to the processor regarding the level of the surcharge, who is to receive the interchange, who is to receive the surcharge, to handle the encryption keys, and to otherwise operate the ATM. I direct the court to JA 6897 where one of the founders of the ATM operator  tenant. This means what it is that an ATM operator does that no other party tends to, which means the encryption keys, communicating regarding the level of the surcharge and who gets the interchange. These are things that a merchant tenant in 2005 when Visa defines an ATM operator, they put a footnote in their rules and it said quite clearly that premises owners are not ATM operators. Even if the merchant loads the cash into the machine, they are not an ATM operator. Even if they receive interchange, they're not the ATM operator. They are never permitted to change the surcharge or direct the distribution of funds or handle encryption keys. Those are the roles of only the ATM operator. Finally, I understand my time is short, but I need to make this point and that is that if in fact there was variation in who paid the acquirer fee, where is the evidence of that? Where is the memo that says, oh, in this particular case, somebody else will pay the acquirer fee? Or the network letter that says, oh, we didn't get the acquirer fee from whoever you are supposed to pay it. The reason there is no evidence of this is because there is a custom and practice in this industry that has been around for almost 30 years, and that is that the employer of the ATM is responsible for the acquirer fee. That is why, without a shadow of a doubt and after a rigorous analysis, which by the way was the standard since 1982, a Supreme Court case by the name of Falcon, I think General Telephone versus Falcon, that's where rigorous analysis comes and Judge Leon is fully familiar with the standard. So, there is really zero evidence on the part of the defendants that shows that there is anything other than the practice and custom that the ATM operator and the employer pays every penny of the acquirer fee, and we stand strongly by our contention that every ATM operator member of the class pays the acquirer fee. Judge Rogers, did you have any further questions from Mr. Rubin? All right. Thank you, Mr. Rubin. I think we'll hear next from Mr. Cooper. Thank you, Your Honor. May it please the Court, David Cooper on behalf of the Mackman class. The defendants make only one very narrow argument against certification of the Mackman class. They say that all the evidence of class-wide entry does not suffice because their expert used Wells Fargo data in his entry model, and that data is supposedly not representative of the class. But in looking at this issue, it's crucial to note that no one uses complete data for all the transactions just like that. It doesn't exist. So the experts had a choice. Do you use the complete data for one bank, Wells Fargo, or do you use incomplete data for the other banks, looking at transactions over one particular network? Each expert explained why they made their choice, why our expert chose to do the complete data for one, why their expert chose to do incomplete data for the others. And the question here is whether the district court and this court can resolve this choice of data battle of the experts on class certification. Let me just tell you one more. Yes. My review of the record in thinking about what the district court did and what the truth of both sides are arguing is, and I can't pinpoint it precisely, one problem that leaps out to me is it does not appear to be common evidence that sustains class-wide entries and that there are a number of persons in the class or classes for whom there is no indication that there is injury. It just seems fairly straightforward to me. And I don't know how, in light of the existing law, that can stand. You're not doubting that they, because my understanding was that your argument was well, we can whittle away, we can work that out later. And I thought the district court was saying, you can work that out later. But there isn't any doubt under the models that are being pressed, there wasn't any doubt in my mind, in the models that are being pressed, there are any large numbers of members in the alleged classes that are not injured. There's nothing to indicate injury. So, no, our position is not that you should be whittling those out. Our position is that there are no uninjured class members. Every single member in all of the stated classes has been shown to be injured. In the MACMU class, I'm not representing anything with respect to the other classes. I'm saying in the MACMU class, there are no uninjured class members. And there are two competing models. One, which shows that net interchange increases surcharge. Their model shows that for some limited number of banks, there's statistics are inadequate to make a determination. But the point is that their model uses incomplete data. Our expert explained that if this court looks at nothing else in the very large joint appendix, we ask this court to look very closely at the section beginning at JA8366. Our expert explains in great detail why their model using, I mean, only chooses transactions over the Visa network is the wrong way to look at this, and that there are no uninjured class members because this idea that they exist only happens because you're looking at a very limited data set, looking at only a particular plan of transactions. So the question is, what do you do when you have competing models? They try to shoehorn it into real estate by saying it's undisputed. It's undisputed. It is disputed. Our model does not show uninjured class members. Their model supposedly shows uninjured class members. And the question is, whose data and whose methodology is correct? That's a classic DABRA question. And they could have raised that in a DABRA vote, and they chose not to. But why aren't they saying, yeah, your data is, at least our data shows your data not to be representative, because we look at these Visa transactions, and what your expert is asserting with respect to the Wells Fargo data appears not to hold with respect to non-Wells Fargo transactions, i.e., Visa transactions. And your response to that is? Our response to that is, when you look at only the Visa transaction, it distorts the entire model. In other words, you don't get a true answer for Visa transactions. You just get a very questionable answer for all transactions. And the reason why, if this court looks at the charts on pages 8377 and 8379, it sort of explains why, which is that the net interchange for the different networks moved at different times. And the mix of what networks ETFs and ATMs were using changed at different times. And as a result, if you're only looking at transactions over the Visa network, you're distorting the entire model because you're looking at how surcharges change generally, but you're also looking at how net interchange changed only for one network, which isn't necessarily representative of the mix of networks and the mix of net interchange fees that the banks received and the banks presumably would be reacting to in raising surcharges. And I think it's also important to note that it's completely false when they say that there are banks that didn't raise surcharges at all during the class period. And I call this course attaching to JA8398-99, where they say 13 banks didn't raise surcharges, that's because they started in 2010. Our class starts in 2007. And to be clear, we say that the NGRs affected net interchange long before that, until the surcharges were high, even at the start of the class period. So Citibank set it high earlier, as you know. Do I have the facts right? Citibank? Yes. You're saying they set it high, they didn't have to raise it in response. Isn't that inconsistent with your theory, which is that it's in response to diminution of net interchange that the surcharges are raised? Yes. It's not inconsistent because net interchange did go down even before the class period. In fact, substantially before the class period. So when they raised surcharges in 2007 to 2008, that was in response to production of net interchange. So these things happen at different points in time, and it's important to keep that in mind. I think the other important point to keep in mind is that even with their model, if you apply it to the entire class period, 95 out of 100 banks of the top 100 banks feel this relationship between net interchange and surcharge. And so for those, there's essentially no dispute that we have common evidence of class-wide injury. And so the question is, what about those other five? And what our argument is is simply that if you're trying to extrapolate because you don't have complete data for those other five. If you're trying to figure out, based on the data we have, does it make more sense to extrapolate from Wells Fargo and from those 95, or do you think that five banks would be such outliers that in response to a lower net interchange, and in response to the other 95 banks keeping surcharges low because they were getting more net interchange in this but-for world without any kind of conduct, those five banks would do nothing. They would keep their surcharges extremely high and be completely undeclared. And our expert explained why in this market, that makes absolutely no sense at all. And while this report, obviously we're not asking you to decide who's making more sense, the question is, I see my time's up, but if I continue. The question is, what are you deciding? Because it can't be that the decision is who's expert is right and who's expert is wrong. That can't be the question on class certification. And I know that the Defendant's Counsel says we'll take a hard look. But the question is a hard look at what? So you're taking a hard look at whether you've decided. You're taking a hard look at the evidence that's being offered to determine whether most of the members of the class are injured. Isn't that what we're supposed to be doing? Is that what the district court judge is supposed to be doing? Are you stating a theory where what you're suggesting as the model for weighing the evidence would exclude a number of the class members? That's not good. That would fail the hard look test. Right? We're not saying that we're saying what you should look at is whether the questions can be answered on a class-wide basis. Not whether or not the questions will be answered in our favor. That's what Adam just said. So the question is not whether we did prove that in fact all of the But if the other side says, and I'm not saying anything about this case, the other side says 20%, 30% of the people in their proposed class under their model cannot possibly be shown to be injured. That fails hard look, doesn't it? If it's cannot possibly, that's rail freight one, yes. Cannot possibly. But if If they say cannot possibly? So rail freight one says detects injury where none can exist. In other words, not whether they say or we say, but whether in fact if injury could not exist, yes, we agree that would fail. Or in rail freight two, if they say our own model shows that they're uninjured class members and there's, quote, no common proof, that would fail too. But when you have a dispute between the experts and the totality of the evidence on both sides of whether they're uninjured class members, the question is, and Tyson explains this very well, is that can that dispute itself be resolved on a class-wide basis? And that's why Tyson said a dispute over whether data is sufficiently represented is one that can be decided on a class-wide basis and therefore does not preclude class certification. So you're certainly taking a hard look, you're taking rigorous analysis of what the evidence is and whether or not the trial, if it goes forward, could be done on a class-wide basis. What you're not doing is deciding who's right or wrong and effectively just sort of taking the merits away from the jury just because it's a class-wide case. And if I could just If I could just close by saying one thing in response to Judge Rogers' question about re-evaluation. Could I just ask you you're reading Tyson to say what? Sure. So I think there are two critical pieces of language in Tyson. The first is that quote, statistically inadequate whether data is statistically inadequate or based on implausible assumptions did not raise a challenge to the and is insufficient. If they don't raise a challenge on number to statistical inadequacy, then that's not a class-wide issue. And then the second piece of language in the court explains why is that because whether or not it was unrepresented or inaccurate is itself coming to the claims made by all class members. So that's ultimately the question. How do we decide this class-wide? Not who's right about it, but can we decide class-wide? And here we clearly can. They're not producing a ton of individual evidence that would force us to not resolve this in a class-wide manner. And we're here with class-wide evidence talking about who's expert is right. And so that can be done on that work. That can be done on summary judgment, but it should not be done on class certification. It's certainly not under a standard where you're saying just, okay, we're going to pick which expert chose the right data. This is not a case where our expert has admitted at all or our model admits at all that they're uneducated. This is where their model, using incomplete data, chose for a small subset that we can't tell because the data is so inadequate that we can't raise a statistical conclusion. So if at a later time, and I'm not sure when it would be, the district judge looks further, hears from these experts at trial, I guess, and Visa and MasterCard move to have the class decertified, and the judge says, look, I'm crediting their data, not yours. The district judge could decertify the class if he credited  You don't have an appellate issue, but you'd have to decertify the class? If it were, for example, I mean, the question is what stage is the judge doing that, right? But if it were, for example, Daubert, let's say they made a Daubert motion, even though they couldn't have made it before, but let's say hypothetically they could raise one later, the judge says, no, this is unreliable, I have to throw it out. Yes, the judge could decertify the class, and Rule 23 accounts for that. Rule 23 says the trial judge does have an obligation to look at the class and to see whether or not the class should remain certified. So we have no problem with the district judge having the The only problem we have is with this court or even on remand the district court deciding at this stage of the proceedings which expert is right and which expert is wrong under some nebulous standard of hard look but we're not going to say sort of what the actual reliability or plausibility standard is. So the district judge is supposed to find predominance but not make fact findings about which expert took Yes, I think that's correct. I think that the question is, if you look at the expert reports, had those issues, the dispute between the experts and more generally whether or not all class members were injured, be decided on a class wide basis. If the need for those reports is such that it cannot be decided on a class wide basis, then you would build predominance. And what's your short answer to why the Wells Fargo data is representative? Sure, so I think there are a couple points to that. First, it is the complete data. There's no dispute that that is in fact the best data to use because it includes all the transactions. So that's why we use it. Now, why is Wells Fargo representative? Our experts explain in great detail why. It's about the nature of this market, which is that it's a commoditized product, ATMs, an extremely competitive market in terms of the surcharges and if you look at the market historically to an empirical analysis of it, the banks do move together. That is to say you don't have these outliers where a lot of money is being spent. So Wells Fargo is one of the largest banks in the country. It exhibited this relationship even using their own incomplete data, 95 out of 100 exhibited this relationship. It is more than a reasonable conclusion from all of that and from their frankly documentary evidence showing that this is in fact actually what happened. It's a far more than reasonable conclusion to say that yes, there is this relationship and this relationship exists for all of the banks. And so that's what our experts said and this is well within its discretion in accepting that conclusion. Right. Questions from my colleagues? No. Right. And we will now hear, thank you Mr. Cooper, we'll now hear from Mr. Lovell or Lovell? Lovell. Lovell for the Burke Planchette. I'd like to start to try to address Judge First, the legal standard for antitrust injury is whether the prices paid in the actual world are higher than what the prices would have been in the but-for world. So that prices can go down in the actual world. The conspiratorial environment, prices can go down. Putting on two of our briefs we cite the low trend, LCD, lots of cases which haven't been contested, that in high-tech cases, in e-books, etc., real-world prices go down. But those prices are higher than they would have been in the absence of the conspiracy. So the trick is to look at the but-for world for the antitrust injury. Now, so their whole standard, this thing, is a false construct. Prices had to go up during the conspiracy period. But let's now just address the differences between this case. That goes back to some extent. The differences between this case and rail freight. So in this case, the price fixing rules existed for every transaction, every day, every year, for 30 years, from the mid-1990s until today. And there was no chance for a competitive market to develop. In rail freight, there was a before period where there was no conspiracy. There was a during period where an alleged conspiracy to fix the fuel surcharge started up. The plaintiffs modeled using the before period for a plain period, their regression, and they came in and they showed that 12.7% of the people had a gain, had negative damages. And that was it. I mean, there's a lot of, rail freight too has a lot of interesting comments in it. But what it comes down to is that Judge Friedman was within his discretion to find that 12.7% is way too much and it's uncontested, and there's no way to get around your own model of what it shows. Here, and here there is no before period. We can't nail to a false standard from a different case where they could have a before period and do a regression. In our case, all the transactions have been conducted in a conspiratorial environment and you can't do a proper regression in that environment. And then, now turn to the admissions that were before Judge Leon by Bennett's expert, Dr. Hubbard. He admitted that his study that the small minority of the ATMs did not raise their surcharges. Small minority. It was 99% of the transactions were subject to raised surcharges in Dr. Laird's rerun. It was 96% of the transactions in Dr. Hubbard's own, the Bennett's expert's own run. And putting that in, he said in his deposition, he was very fastidious, I am not saying that there's no relationship. I'm not saying that there's not the negative relationship. I'm only saying that the plaintiffs have not demonstrated. Well, Dr. Hubbard, have you given a good analysis? No, it pains me to say that my analysis is not a good analysis. We quote this in our, it's J.A. 7433-34 and 7458. Dr. Hubbard said he doesn't have a good analysis. Well, why do you have the analysis? It's really plaintiff's analysis, he said. I'm taking what plaintiffs would have done. And so then Dr. Laird, the economist for the Burke plaintiffs comes back in rebuttal and points out the data that Dr. Hubbard selected was not at the ATM level. Dr. Laird, in the rebuttal, ran regressions at the ATM level and had statistically significant one-to-one relationship results. Dr. Laird points out that what Dr. Hubbard did was to take what's called ISOs which are ATMs are coming in and coming out, coming in and coming out month by month. The thing is changing. So then while it's changing, Dr. Hubbard is averaging within these periods and as the periods go forward, he still finds that 92% of the ATMs, which had 96% of the transactions, had the prices gone. Not the legal standard, it's just whether it's hiring a conspiracy. But he finds that and Dr. Laird finds it's 99%. And Dr. Laird's rebuttal says his analysis was doomed to fail. It was doomed to fail because he only looks up one level above the ATMs. There's all these mixers going on. He didn't say it's a miracle that it worked out in our favor, but he does reaffirm the industry wide tax principle. So we're not deciding this issue in the first instance. What do we do with the fact that there is language in the district court opinion referring to tolerable method, referring to a critique of Professor Carlton's reliance only on Wells Fargo, data as better suited for adjudication of plaintiff's injury and damage of merit. What do we do with what seems to be references to tolerable method rather than, for example, a common method? How can we affirm if those are not legally correct? What constitutes a hard look depends upon the disputes before the court. There's many other distinctions between Rail Freight and Comcast as your Honor mentioned with the mismatch between the claims and what was shown and Rail Freight 1 which had the legacy contracts that couldn't have been subject to price fixing because they were made beforehand in the class. We don't have any of that here. What constitutes a hard look in this situation? I say, I submit, your Honors have to look at the decision compared to the record and there is a finding as your Honors pointed out, Judge Clark, right at the beginning, that satisfies the standard and there are infelicitous words that show up in a detailed analysis of going through what the judge thinks about three complicated cases and so the law evolves, Rail Freight 2 happened, now we're going on to a totally different fact situation where the judge did not use the exact right words, two points, but three points in the opinion. So that's where the law is. And what are we going to do? Your Honors know better than I, but Judge Marrero has a law review article in the Cardozo Law Review. He's a district court judge in New York about how long it takes to do a complicated case nowadays. The judge does not get rid of a complicated case in the district courts in New York. The judge is signing on for all these big thick papers, over and over and the search for any problem with every ruling is intense because of the amount of money. And in my practice, which is class actions, I see that papers are put in where it seems to me the strategy of the defense is to provoke us, to put in a long paper to rebut it. And it all adds to the district court's work. So maybe you could take that back into consideration as a policy issue of what's going on in the courts. Well, the problem, of course, is that district courts may have to work harder, but they've also got to comply with the rules that are applicable at the time they're deciding the case. And I think you make some nice arguments. And the question I keep thinking about in my mind is what counsels seem to be asking the appellate court here to do is to go through this very detailed analysis that you cannot find in the district court's opinion other than some sort of conclusory sentences with some examples. And giving the benefit to the district court, we try to read his opinion consonant with the correct law. And I guess at some point when the district court cites the standard in vitamins and the law has just moved on since then, that is very troubling. If on remand the district court were to reference the correct standard, it is not inconceivable to me that some of the analysis you and other counsel have suggested to this court today and in your brief could still decide having taken a hard look to certify the class. And I know nobody wants to stretch this out further. Nobody wants to multiply the district court's burden. But I have seen appellate courts write opinions that say, well, the district court didn't say beyond a reasonable doubt, but he said it was pretty clear the defendant was pretty guilty. You know, it's not good enough. This isn't a criminal case, I understand. It's a whole industry involved. Major statutory provisions. So I guess that's where I'm troubled here. And I think a lot of the questions that Judge Hillard raised, you know, make some excellent points that Judge Edwards raised, make some excellent points, and then sort of what do we do now? And, you know, reading another judge's analysis about it's gotten very burdensome to be a district court judge these days because of the complexity of the cases. Well, try being on the Court of Appeals. I don't think that helps us much, but that doesn't mean I don't think other parts of your argument have been, and of counsel's, other counsel's arguments have been very helpful. Well, Judge Rogers, I don't mean to shift the burden to this court, and I know that the more that the district court does, the better for this court. And the question is how to get there. In this case, how to decide this case and get to where you want to get. And you wouldn't want to, if you knew enough about the record without burdening yourself too much, you wouldn't want to throw the baby out with the bathwater. If the facts here are strongly in favor of the plaintiffs, under the antitrust injury standard of paying higher amounts in the actual world than the price fixing for 30 years, and where there is winnowing, each one of these terminals has a number in the code. The winnowing, which is recognized by Rail Freight 2 as a way out of even the de minimis, there is no de minimis. Dr. Hubbard does not offer the opinion there's a de minimis. Dr. Hubbard projects what he did as the plaintiffs work. It's not, but getting back to the main point, how to get there does not require in this case, vacating or reversing. It requires, if your honors reach the state of mind that I'm arguing for, it requires saying that you can't do this and you can't do this in the future, but the hard look that the judge took and the record were satisfied that in this case, there is not a class certification issue that doesn't have winnowing, that there's an error. There's an error in a couple of words. There's some dated words in the opinion for the reasoning, but when you apply the non-erroneous words, which are unqualifiedly correct resolutions  unlike the concessions in Rail Freight 2, Rail Freight 1, Comcast, but the expert in Comcast said, no, my model doesn't satisfy the only claim that happened. Now that the laws moved on during this new tax situation, you don't have to, in my humble opinion, you don't have to reverse or vacate in order to fully do and give instructions to this report. I think I've gone over my time here. All right, yeah. Well, everybody did, and it's helpful to have your answers to our questions. We appreciate the guidance. I think we have, thank you, Mr. Lovell, we have a rebuttal from Mr. Anderson for the appellant. And Mr. Anderson did not have remaining time. He had requested five minutes. We'll give you three. Thank you, Your Honor. I'd like to begin with addressing the question of what should the court do? We've proposed that in light of what we consider to be the clarity of the evidence, there is an injured class member in each class and applying the appropriate legal standard, there's really nothing more for the district court to do, and in the interest of judicial economy, this court would simply reverse. It is certainly within the court's discretion to conclude that the record is not as clear as MasterCard and VISA present. To vacate and rematch the district court or Judge Leon to do in the first instance what Rail Freight requires, which is to take a hard look at whether the class presented models that can show common evidence establishes class-wide injury. As to the arguments that we heard from plaintiff's counsel as to why this court should not vacate, they were all presented in either Rail Freight 1 or Rail Freight 2. For example, I just heard Mr. Lovell argue that he can't be held to show class-wide injury as common proof because it's complicated, and our experts didn't come forward and disprove this theory. And both of Mr. both the Burt class and the innocent operator class argued that absence of evidence doesn't indicate evidence of absence, shifting their burden of proof of evidence to the defendants to disprove it. That was addressed in the first Rail Freight decision quite clearly, where this court said, you can't shift the burden to defendants to disprove that common evidence can support injury. You need to come forward with common evidence showing class-wide injury. This is also not the battle of the experts as the lawyer for Maxon was arguing. I did not, when I presented earlier, I did not argue what Dr. Hubbard showed. I described their model. Their model is a one-to-one relationship between decreases in net interchange and increases in surcharge. That's their theory, not Dr. Hubbard's theory. We then looked at data to see whether it is in fact the case that when net interchange goes down, surcharges go up. Dr. Hubbard found 15 where it didn't, and 13 where it didn't increase at all during the relevant time period, which was 2015. Who chose that time period? Professor Carlson, their expert. We used that time period because that's what their expert determined was appropriate based on, and I'll refer the court to Joint Appendix 3082, the fact that in 2010 there was a significant reduction in net interchange. That's why all of these cases were filed in 2011, and that's why the only question that is relevant here is what happened after that industry-wide reduction. Well, they say something different. They say that there was a drop also in, I think it was 2006, 2007. Don't quote me if I conflict with what's in the record on that, and that there was another raise in access fees earlier, and that the limitations to 2010 worked with the data they were using, but was distorting with the data that your expert was using. Without resolving that, those all are, according to this report, issues that don't break the sort of general wholesale nature, yay or nay, of the issues presented down the road. I understand, but they had an obligation to come forward with a model of injury. In Route 32, the court said that in antitrust actions, common questions can't predominate, without reliable means of proving classified injury. They had to come forward with a model. That is something that Judge Leon held. He said they have standard and reliable means of showing classified injury. He didn't go in as much chapter and verse to explaining why that wasn't taken down by their counter-evidence, but he did. He did make that determination. But he didn't do the work, Your Honor. He was supposed to take a hard look at the evidence we presented, grapple with, and explain. He didn't just, and Judge Reiser has mentioned that he announced the wrong standard in his decision. He didn't just announce the wrong standard. He applied the wrong standard. Every single paragraph of the two pages in his decision where he explains why plaintiff's models were sufficient refers to them as either quote, colorable, reasonable, well-established, well-accepted. Colorable, well-accepted, colorable. These are words that are not just in the standard. Other words that are closer to what I think was the standard he was supposed to apply. The fact that he didn't write an opinion that was 300 pages long is not critical here, it seems to me. I agree. The question in my mind still is the legal standard he applied and some of the statements Judge Pillard was referring to. In addition, there are statements where the district court found that the plaintiffs could rely on reliable data, that sort of thing. I think we understand this argument with all due respect. With respect to the representative nature of the representatives of the data, if you would ask about whether someone who banked at Citibank could rely on the Wells Fargo data to prove his or her injury, that's exactly the right question. Under Tyson, you can come forward with representative evidence if any individual in the class could rely on that evidence to prove his or her case at trial. If you are someone who withdrew cash from a Citibank ATM that did not increase their charge, you cannot come into court and say, well, they increased it over there at Wells Fargo. That is an underlying factual dispute, whether Citibank did not increase their charge. The plaintiffs are saying our evidence showed Citibank to increase their charge at the end that you were looking at. I understand that's a dispute that remains pending, but whether it's susceptible of class-wide determination, you haven't made crystal clear to me why not. Because how would you, based on the models... Why don't you wrap up and we'll take the case. Based on the models that the plaintiffs put forward, what is the whittling mechanism? How is the district court supposed to remove the class members who withdrew cash only from Citibank and all the other ATMs that did increase their charge? No plaintiff has come forward with a model that says, plug this model in and see which expert is right, but if they're right, if they all increase their charges, it'll be fine. If defendants are right, the jury has evidence that some ATMs did not increase their charges, plug that model in, we can whittle out the uninjured. They have not come forward with that. They reject that they even have the burden of it, because they rely on a simplistic theory of injury, which is one-to-one. And they had 10 years to develop it, they had full access to discovery, and they have the assistance of able counsel and a talented economist, and that was what they submitted, that it's insufficient under real freight, the district court should reverse the district court's decision. Thank you. Thank you so much.
judges: Pillard, Edwards, Rogers